## STATE OF CONNECTICUT *v.* CALVIN LONG
(SC 18282)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Vertefeuille, Js.

Argued January 13—officially released June 21, 2011

*Monte P. Radler*, public defender, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Vicki Melchiorre*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. In 1986, the defendant, Calvin Long, was committed to the jurisdiction of the psychiatric security review board (board), following a finding of not guilty by reason of mental disease or defect of assault in the second degree, and he has remained under the board's jurisdiction ever since. This appeal concerns the defendant's second attempt to challenge, on equal protection grounds, the state's most recent petition to continue his commitment under General Statutes § 17a-593 (c).[1] In a previous appeal, this court concluded, contrary to the determination of the trial court, *Miano, J.*, that the legislature had a legitimate basis for providing review procedures for the continued commitment of insanity acquittees (acquittees) different from those afforded to convicted defendants who have been transferred to a mental health facility after their incarceration and thereafter are subject to statutory civil commitment proce-

[1] General Statutes § 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or mentally retarded to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee."

dures (civilly committed inmates).[2] See *State* v. *Long*, 268 Conn. 508, 536–37, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). Following our remand, the trial court, *Blue, J.*, denied the defendant's motion to dismiss and granted the state's petition to continue the defendant's commitment. The defendant's principal claims in the present appeal are that the trial court improperly construed this court's decision in the previous appeal to preclude his equal protection challenge to § 17a-593 (c), and that a higher level of scrutiny of the statutory scheme should apply to this claim than we had applied to his claim in the previous appeal. We conclude that our decision in the previous appeal precludes the defendant's present claims. Accordingly, we affirm the judgment of the trial court.

Because our resolution of the present appeal depends on the scope of the earlier proceedings, we first must set forth the undisputed facts and procedural history relative to those proceedings in some detail. In March, 1986, the defendant was charged by information with assault in the second degree in violation of General Statutes (Rev. to 1985) § 53a-60, a class D felony, after striking a person in the head several times with a hammer. The defendant was found not guilty by reason of mental disease or defect pursuant to General Statutes § 53a-13 (a). Following an assessment of his mental health, the court ordered the defendant committed to the board's jurisdiction for a term of five years, a period equivalent to the maximum sentence that the defendant could have received if he had been convicted of the underlying offense. Prior to the expiration of that term,

---

[2] General Statutes § 17a-515 provides that the civil commitment procedures set forth in General Statutes § 17a-498 shall apply to persons under the custody of the commissioner of correction. General Statutes § 17a-520 contains the procedures for retaining civilly committed inmates in a mental health facility following the expiration of their term of imprisonment.

the state's attorney petitioned the Superior Court, pursuant to § 17a-593 (c), to continue the defendant's commitment on the ground that he remained mentally ill to the extent that his discharge would constitute a danger to himself or others. After a hearing, the trial court granted the state's petition and continued the defendant's commitment for a term of three years. On three subsequent occasions, the state successfully petitioned the Superior Court to continue the defendant's commitment.

In March, 2001, the state filed another petition to continue the defendant's commitment. In response, the defendant filed a motion to dismiss the petition, claiming, inter alia, that, "[o]nce an acquittee reaches [his] maximum term of recommitment, the reasoning of *Fasulo* v. *Arafeh*, 173 Conn. 473 [378 A.2d 553] (1977), *State* v. *Metz*, 230 Conn. 400 [645 A.2d 965] (1994), and related cases, by extension, renders a state's petition for recommitment pursuant to . . . [§] 17a-593 (c) unconstitutional in both procedure and effect."[3] The trial court, *Miano, J.*, granted the defendant's motion to dismiss the state's petition, concluding that § 17a-593 (c) violated the defendant's right to (1) due process under the state constitution because the commitment scheme improperly vests the board with authority to

---

[3] "In *Fasulo* v. *Arafeh*, supra, 173 Conn. 479, this court concluded that commitment of an individual to a mental [health facility] must end when the legitimate state interest in confining the person no longer exists, and therefore, in order to satisfy the due process clause of the Connecticut constitution, 'involuntarily confined civilly committed individuals [must] be granted periodic judicial [review] of the propriety of their continued confinement.' " *State* v. *Long*, supra, 268 Conn. 522 n.22. In *State* v. *Metz*, supra, 230 Conn. 400, this court construed § 17a-593 (c) as "impliedly impos-[ing] the same burden on the state at a hearing for the continued commitment of an acquittee beyond his current definite period of commitment as is imposed in a civil commitment hearing under [General Statutes] § 17a-498 (c); namely, to show by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself . . . or others or gravely disabled." Id., 425.

assess an acquittee's status and does not afford an acquittee periodic judicial review of his status, (2) equal protection under the federal constitution because there is no rational basis to treat differently acquittees who have served their maximum term of commitment and civilly committed inmates, and (3) equal protection under the state constitution because the lack of a rational basis for the disparate treatment dictated the conclusion that the statute also did not meet the strict scrutiny standard that applies to the constitutionally protected class of the mentally disabled.[4] The trial court therefore declared § 17a-593 (c) unconstitutional and granted the defendant's motion to dismiss.

Following the state's appeal, this court reversed the trial court's judgment. With respect to the due process issue, we agreed with the state that the question, "properly framed, is whether § 17a-593 (c), *as applied to the defendant,* deprived [him] of [his right] to procedural due process in the particular circumstances of [this] case, and not merely under some possible or hypothetical set of facts not proven to exist." (Emphasis in original; internal quotation marks omitted.) *State* v. *Long,* supra, 268 Conn. 523. In addressing that question, we

---

[4] In *State* v. *Long,* supra, 268 Conn. 534–35, this court set forth the well settled principles that apply to equal protection claims under the state and federal constitutions. Generally, "it is necessary that the state statute [or statutory scheme] in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . Thus, the analytical predicate [of consideration of an equal protection claim] is a determination of who are the persons similarly situated." (Internal quotation marks omitted.) Id., 534. The nature of the distinction on which these classifications are based dictates which of three increasingly deferential levels of scrutiny will apply, namely, strict scrutiny, intermediate scrutiny or rational basis review. See, e.g., *Kerrigan* v. *Commissioner of Public Health,* 289 Conn. 135, 158–61, 957 A.2d 407 (2008). When "the classification at issue neither impinges [on] a fundamental right nor affects a suspect group it will withstand constitutional attack if the distinction is founded on a rational basis. . . . Rational basis review is satisfied [as] long as there is a plausible policy reason for the classification . . . ." (Internal quotation marks omitted.) *State* v. *Long,* supra, 535.

outlined the statutory procedures and attendant protections applicable to the defendant during his term of commitment.[5] See id., 525–26. We explained the board's oversight role, which is reflected in (1) the board's receipt of a report, every six months, on the defendant's status from the mental health facility where he was confined; see General Statutes § 17a-586; (2) the requirement that the board hold a hearing on the defendant's mental status at least once every two years; see General Statutes § 17a-585; and (3) the board's option of recommending to the court that the defendant be discharged pursuant to § 17a-593 (a). *State* v. *Long,* supra, 527. We underscored the fact that the defendant had obtained judicial review on the five occasions that the state petitioned for continued commitment; see id., 526; and the fact that he never had invoked his statutory right to initiate judicial proceedings to obtain his release. Id. Accordingly, we concluded that there was no due process violation. Id., 527.

---

[5] We noted the following procedures and protections: "[T]he defendant (1) was given a copy of the petition[s] [for continued commitment]; see General Statutes § 17a-593 (a); (2) was afforded the right to be present at the hearing[s] [on the petitions] and the right to be represented by counsel; see General Statutes § 17a-598 (a); (3) had the right to a separate and independent review of his mental health [status] by an independent psychiatrist or psychologist of his choice; see General Statutes § 17a-593 (e); and (4) had the right to examine all documents and reports considered by the court in preparation of his defense. See General Statutes § 17a-598 (b). In each instance, the defendant was in fact represented by counsel, [which was] supplied by the state. Furthermore, prior to each hearing, the board filed a report with the court . . . and gave copies to the defendant and the state, as to whether the defendant should be discharged. See General Statutes § 17a-593 (d). In each instance, the trial court ordered the defendant recommitted for periods ranging from eighteen months to three years. During [each] term of recommitment, the defendant had the right to apply directly to the court for his discharge every six months; see General Statutes § 17a-593 (a); however, he never exercised that right. [If] the defendant [had] submitted such an application at any point during his commitment, the court would have been required to hold a judicial hearing on whether the defendant should be discharged. See General Statutes § 17a-593 (f)." *State* v. *Long,* supra, 268 Conn. 525–26.

With respect to the defendant's state and federal equal protection claims, we first contrasted the statutory procedures available to acquittees to challenge their continued commitment with those available to persons civilly committed, including civilly committed inmates. See id., 528–30. With respect to the latter, we observed: "The [mental health facility] in which the individual is committed annually must notify [him] that he has a right to an additional hearing regarding his continued commitment. General Statutes § 17a-498 (g). That statute also provides that if the [committed individual] does not request such a hearing, or the hearing does not result in [the individual's] release, the Probate Court must hold a hearing at least once every two years to revisit the issue of continued commitment. It is this required biennial judicial review, which is not applicable to acquittees, that is the *principal* distinction in the recommitment processes for civil committees and acquittees." (Emphasis added.) *State* v. *Long*, supra, 268 Conn. 530.

This court determined that the proper level of scrutiny to examine these procedural differences under both the federal and state constitutions was rational basis review. Id., 535, 540. Proceeding under that standard, we concluded that we had "no difficulty in ascertaining two rational reasons for the disparate treatment in statutory recommitment procedures for acquittees as compared to civilly committed inmates.

"First, under the acquittee statutory scheme, the board has general and specific familiarity with all acquittees beginning with their initial commitment and, therefore, is better equipped than courts to monitor their commitment. By placing oversight of these individuals in a single administrative agency, such as the board, which is comprised of laypersons and experts in relevant areas, including psychiatry, psychology, probation, and victim advocacy, the legislature reasonably could

have believed that the board, with its expertise and familiarity with the mental status of each acquittee, would be better equipped than a court to monitor the [acquittee's] recommitment. This furthers the legislature's legitimate interest in efficiently managing the recommitment of acquittees. . . .

"Second, the state clearly has an interest in ensuring that its citizens are not erroneously committed . . . on [the basis of] harmless, idiosyncratic behavior. See *Addington* v. *Texas*, 441 U.S. 418, 426–27, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). The legislature, however, reasonably could have concluded that the risk of erroneous commitment is far less for an acquittee and, therefore, [that] additional mandatory judicial review during the recommitment is unnecessary. Specifically, the legislature could have determined that the likelihood of an erroneous commitment is reduced in the case of an acquittee because an acquittee initiates the commitment process himself by pleading and proving the mental illness that led to his commission of a crime. As the United States Supreme Court stated in *Jones* [v. *United States*, 463 U.S. 354, 367, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983)]: [S]ince [commitment as an acquittee] follows only if the acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important[ly], the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere idiosyncratic behavior . . . .

"Accordingly, we conclude that a rational basis exists for the legislature's differential treatment of acquittees and civilly committed inmates, and, therefore, § 17a-593 (c) does not violate the defendant's . . . equal protection [rights]." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, supra, 268 Conn. 536–37. We therefore reversed the judgment of the trial court,

*Miano, J.*, which had dismissed the state's petition to continue the defendant's commitment, and remanded the case for further proceedings consistent with our opinion.[6] Id., 541.

The defendant filed a motion for reconsideration en banc. He claimed that this court's reasoning was unsound and that, by focusing on the issue of mandatory judicial review, the court had "lost sight of the many wide-ranging systematic claims made by [the defendant] in his equal protection argument." He acknowledged that his appellate brief had focused principally on judicial review but explained that his brief was essentially a reply to the state's arguments for reversing the trial court's judgment and that he had relied on this court's consideration of these broader issues in his appeal in light of briefs filed in a concurrently pending appeal in another case, in which the same issues were raised and briefed extensively.[7] This court denied the defendant's motion.

With this background in mind, we set forth the facts and proceedings that have culminated in the present appeal. On remand to the trial court following a final resolution of the defendant's first appeal, the defendant filed his second motion to dismiss the state's 2001 petition for recommitment. In that motion, the defendant

---

[6] We note that, in *State* v. *Metz*, supra, 230 Conn. 400, this court stated that, "[a]fter the expiration of a maximum term of confinement, it is difficult to find a constitutional justification for a categorical distinction between an . . . acquittee and an incarcerated prisoner who was transferred to a mental [health facility] while he was serving his criminal sentence." Id., 424. In *State* v. *Long*, supra, 268 Conn. 508, however, we stated that "*Metz* was a statutory construction case concerning the burden of proof for recommitment that merely employed constitutional principles to aid in its analysis." Id., 537 n.38. As we explain more fully hereinafter, we decline to revisit our analysis or holding in *Long* in view of the history and procedural posture of the present appeal.

[7] That appeal was dismissed as moot shortly after this court heard oral argument in *State* v. *Long*, supra, 268 Conn. 508.

restated verbatim the claim that he had made in his first motion to dismiss, with the addition of one phrase: "[O]nce an acquittee reaches [his] maximum term of recommitment, the reasoning of *Fasulo* v. *Arafeh,* [supra, 173 Conn. 473], *State* v. *Metz,* [supra, 230 Conn. 400], and related cases, by extension, renders a state's petition for recommitment pursuant to . . . [§] 17a-593 (c) unconstitutional in both procedure and effect, *notwithstanding the recent decision of the Connecticut Supreme Court in State* v. *Long,* [supra, 268 Conn. 508]." (Emphasis added.) In his memorandum in support of the motion, the defendant asserted that the scheme applicable to acquittees imposes stricter substantive standards and less favorable procedures than the civil commitment scheme applicable to civilly committed inmates, and these disparities, although possibly constitutional *before* the acquittee has served a term of commitment equal to the maximum term of imprisonment that he could have received if found guilty of the crime charged, cannot constitutionally be applied *after* that period. The defendant acknowledged that he had asserted this same broad claim in his first motion to dismiss. He nonetheless contended that our decision in his first appeal did not bar consideration of this claim on remand because both the trial court's decision granting his first motion to dismiss and this court's reversal of that decision were limited to constitutional concerns relating solely to the lack of mandatory periodic judicial review for acquittees.

While the defendant's second motion to dismiss was pending, this court issued its decision in *State* v. *Harris,* 277 Conn. 378, 890 A.2d 559 (2006). In *Harris,* we concluded that the trial court properly had denied a motion to strike the board's report, which was submitted in response to the state's petition for continued commitment, because, contrary to the acquittee's claim, the dangerousness standard that the board applies is not

functionally different from the standard that applies in civil commitment proceedings. See id., 388–89. In response to that decision, the defendant filed supplemental memoranda of law in which he eschewed arguments based solely on textual differences in the standards and instead broadened his focus to the board's practices in applying those terms. The defendant noted that a statute can be deemed unconstitutional either on its face or as applied. The defendant also asserted for the first time that intermediate scrutiny,[8] not rational basis review, was the proper level of scrutiny for the equal protection claim that he had advanced in his second motion to dismiss. Alternatively, he contended that, if rational basis review constitutes the proper level of scrutiny, that standard is not necessarily met if the conditions that motivated the legislature to create the separate scheme for acquittees no longer exist (changed conditions).[9]

After a period of delay, the trial court, *Blue, J.*,[10] held consolidated hearings on the state's petition for

---

[8] "Intermediate scrutiny typically is used to review laws that employ quasi-suspect classifications . . . such as gender . . . or [il]legitimacy . . . . On occasion intermediate scrutiny has been applied to review of a law that affects an important, though not constitutional, right. . . . Under intermediate scrutiny, the government must show that the challenged legislative enactment is substantially related to an important governmental interest." (Citations omitted; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 160, 957 A.2d 407 (2008).

[9] These changed conditions alleged by the defendant apparently refer to changes that pertain to the manner in which acquittees and civil committees are treated under the respective governing statutory schemes and that have occurred since the legislature created the board and delineated the scope of its jurisdiction in 1985, including, for example, what the defendant has characterized as the state's "develop[ment] [of] an extensive civil outpatient service network in parallel with the [board] system [for acquittees that], in tandem with advances in psychiatry . . . effectively monitors and provides treatment to a population demographic comparable [to the defendant's] population demographic."

[10] Hereinafter, all references to the trial court are to the court, *Blue, J.*, unless otherwise noted.

continued commitment and the defendant's motion to dismiss the petition.[11] During the first day of hearings, the trial court expressed concern that, "in . . . *Long* itself, the state Supreme Court makes clear that any constitutional challenge to the statute or statutes at [issue] must be on an as applied basis. . . . I understand that certain of the [defendant's] arguments might be called 'facial' in nature. But, nevertheless, the [defendant] himself, in his brief, at least implicitly recognize[s] that the challenge should be as applied to the facts at hand." Thereafter, the defendant introduced evidence as to the different operation and effect of the two schemes generally. In his trial brief, the defendant explained that he primarily was asserting an as applied challenge to § 17a-593, but he did not concede that this court's earlier decision precluded him from asserting a facial challenge.

In its memorandum of decision, the trial court first addressed whether the state had met its burden under § 17a-593 (c) of proving that the defendant's continued commitment was warranted. The court noted that the experts had agreed that the defendant suffered from schizophrenia and that this condition caused him to have delusions that other people were making homosexual advances toward him and to engage in violent behavior in response to those delusions. The state's expert testified that the defendant had committed approximately fifteen assaults since 1998, the most recent of which involved an incident that occurred in August, 2007, and that he had kissed and fondled female hospital staff members as well. The court noted that defense counsel had conceded that the defendant is "seriously and persistently mentally ill." In light of this uncontradicted evidence, the trial court found that there was clear and convincing evidence that the defen-

---

[11] Although the precise reason for the delay is not clear from the record, there is nothing to suggest that it is attributable to the court.

dant was, as of July, 2008, mentally ill and a danger to others. Because such findings would support an order to continue commitment, the court next considered whether there was any constitutional impediment to granting the state's petition.

Noting its difficulty in ascertaining with any certainty the precise constitutional violation being alleged in light of the "sheer volume" of the defendant's "bulky submissions,"[12] the trial court stated its understanding of the claim as follows: "[The defendant] is seriously and persistently mentally ill. He has been committed as an insanity acquittee for almost twenty-two years. During this time, his mental condition has not only not improved but is, if anything, becoming worse.[13] Barring

[12] The trial court repeatedly requested that the defendant provide the court with a concise and less abstract statement of the claim being advanced. The trial court's task of discerning the exact nature of the defendant's constitutional claim was made more difficult by the fact that the defendant had submitted, inter alia, a memorandum in support of his motion to dismiss, a supplemental memorandum in support of the motion to dismiss, a memorandum supplementing his trial memorandum from the first motion to dismiss to address the effect of *State* v. *Harris*, supra, 277 Conn. 378, as it relates to the legal standard to be applied, a prehearing memorandum of law on the motion to dismiss, a trial memorandum, a corrected trial memorandum, and a reply memorandum to the state's memorandum in support of its petition for continued commitment. Most of these submissions are between fifty and seventy pages in length, and some are accompanied by voluminous appendices. Having reviewed these submissions, although they clearly reflect defense counsel's vast knowledge and nuanced understanding of commitment procedures, statutes and case law, we fully appreciate the difficulty that the trial court encountered in attempting to comprehend the defendant's claim.

[13] When the trial court decided the defendant's second motion to dismiss the state's petition for continued commitment, it had before it two reports from the board on the defendant's mental health status, one dated June 27, 2005, and one dated February 8, 2008. Both recommended continued commitment. In the conclusion to the 2005 report, the board found that the defendant had "demonstrated significant clinical gains" over the preceding two years but also that his course of treatment had been "punctuated with violent behavior . . . [as well as] a waxing and waning of serious psychotic symptoms and noncompliance with prescribed medication . . . ." In the conclusion to its 2008 report, the board determined that, although the defendant had "experienced some periods of relative pro-social behavior and

a miracle, no significant improvement in his mental condition [is to] be expected. This means, as a practical matter, that, if [the defendant's] legal matters continue to take their statutory course, he is likely to be held in the custody of the board for the rest of his days. If, however, he were treated as a civil committee, he would likely, given the approach currently used by modern mental health authorities with authority over civil committees, be transitioned into the community within a relatively short time, perhaps a matter of months." The trial court also noted, however, that "[t]he unhappy but inescapable facts of this case firmly establish that, if [the defendant] were transitioned into the community, it would . . . be [only] a matter of time before he committed another assault." Peter M. Zeman, a psychiatrist at the Institute of Living in the city of Hartford who testified for the defendant, acknowledged that, in light of the defendant's history, the likely course of his treatment under the civil system would be as follows: upon reaching a sufficiently stable level, the defendant would be discharged from the mental health facility into a voluntary outpatient treatment program, and, subsequently, he would decompensate to the point that he might again become dangerous, in which case he would be readmitted to the mental health facility. This process could be expected to repeat itself due to the variable nature of the defendant's condition. The defendant urged the trial court to conclude that "this disparity of governmental treatment between assertedly similar classes of [committed individuals] results in an 'as applied' violation of the equal protection clause."

treatment compliance, the serious symptoms of [his] psychiatric illness remain. [The defendant's] most recent hospital course is significant for physical aggression [toward] other patients and inappropriate sexual behavior toward staff [members] . . . . Given that [the defendant] has not yet been able to attain and maintain psychiatric stability, and his clinical instability has resulted in repeated acts of aggression, [the defendant] cannot reside safely in the community and should remain under the jurisdiction of the [b]oard."

The trial court noted that it was bound by this court's earlier decision in *Long* and that the defendant's arguments effectively amounted to criticisms of that decision. The trial court observed that, although this court had left open the possibility of an as applied challenge, the defendant had been "unable to articulate any cognizable reason why the statute, held by [this court] . . . to be facially constitutional, is unconstitutional [as] applied to *him*." (Emphasis in original.) The court stated: "[The defendant's] argument, as best I understand it, is that he has a serious and persistent mental illness, and that the statute consequently has a much more serious impact on him . . . than it would in the case of an acquittee with a relatively transient mental illness. But while the factual predicate of this argument is established by the record, it is difficult to see how these facts alone can lead to a finding of unconstitutionality as applied." Accordingly, the trial court denied the defendant's motion to dismiss the state's petition for an order of continued commitment, granted that petition and continued the defendant's commitment for a term of three years. This appeal followed.[14]

On appeal, the defendant contends that (1) the trial court improperly construed this court's prior holding with respect to the defendant's equal protection challenge and that, under a narrower construction, his claim that § 17a-593 (c) is facially unconstitutional must be reconsidered, (2) intermediate scrutiny is the proper level of scrutiny for his equal protection challenge, (3) even if rational basis review remains the standard, evidence of changed conditions since the enactment of the relevant statutory scheme must be considered in ruling on the constitutionality of § 17a-593 (c), and (4) the trial court's analysis of his as applied challenge was

[14] The defendant appealed to the Appellate Court from the trial court's judgment, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

flawed.[15] The state contends that the defendant's facial challenge is precluded under principles of res judicata, law of the case and stare decisis.[16] The state further contends that the defendant's purported as applied challenge fails to state such a claim and fails on the merits.

We conclude that the doctrine of res judicata precludes the defendant's facial challenge in the present case because he seeks to relitigate essentially the same claim that we decided against him in his previous appeal and to achieve a different result by having us apply a different level of scrutiny. We further conclude that, because the defendant has not distinguished his as applied challenge from his facial challenge, our decision in the previous appeal similarly disposes of his as applied challenge to § 17a-593 (c).

I

To resolve the present appeal, some clarification of the issues is required. We begin by noting that the defen-

[15] The defendant also asserts that, as an alternative to declaring § 17a-593 (c) facially unconstitutional or unconstitutional as applied, this court has authority to construe an order of continued commitment under § 17a-593 (c) as (1) a civil commitment order, or (2) a directive for a mental health facility to institute civil commitment proceedings. Because we conclude that the trial court properly denied the defendant's motion to dismiss the state's petition for an order of continued commitment, we have no reason to consider the propriety of placing such a gloss on the applicable statutory scheme.

[16] The state also contends that the defendant waived his right to assert a facial challenge because he had failed to challenge the trial court's decision to analyze his claim only on an as applied basis. We disagree with this contention for two reasons. First, the state took a different position in its posttrial brief, in which it asserted that "[the defendant] did [not] allege any new facts that would support an 'as applied' violation. This [c]ourt, on its own, indicated to [the defendant] that, as a result of the holding in *Long*, he would be limited to an 'as applied' argument in the evidentiary hearing on [the defendant's] second [m]otion to [d]ismiss. [The defendant] *did not agree that he should be so limited*." (Emphasis added.) Second, it is apparent that the defendant never understood the term "as applied" to mean as applied to him individually but, rather, to mean the legal context of the claim as applied to the two classes of committed individuals. Therefore, he has argued that our decision in *Long* addressed an as applied challenge to the lack of periodic judicial review.

dant does not dispute that the state satisfied its burden of proving that he is mentally ill and a danger to others. Therefore, he does not contend that continuing his commitment was per se improper. Rather, his challenge focuses on whether it violates equal protection to continue his commitment under the board's jurisdiction rather than under the civil commitment system. The defendant raises this claim under the federal constitution only and no longer advances a due process argument.

With respect to the equal protection claim before us, the trial court identified the purportedly similarly situated classes, namely, acquittees who have served their maximum term of commitment and civilly committed inmates whose term of imprisonment has expired.[17] The trial court also identified the purported *effect* of the allegedly disparate treatment, namely, longer periods of continued commitment for those acquittees. It did not, however, identify the purported *cause* of this effect.

In his brief to this court, the defendant characterizes that cause as follows: "Connecticut's civil and criminal commitment systems operate according to different legal and clinical treatment paradigms . . . ." He then refers us to a two page excerpt from the operational procedures manual of the Whiting Forensic Division of

---

[17] The defendant varyingly refers in his briefs to the class to which he belongs as acquittees who have served their maximum term of commitment and as acquittees who have served the maximum potential sentence for the underlying criminal conduct. We note that these terms are not synonymous. Following an acquittal by reason of mental disease or defect, a court may set a maximum term of commitment that is less than the maximum sentence for the underlying offense. See General Statutes § 17a-582 (e) (1) (A). We also note that the state contends that the classes on which the defendant's equal protection claim is based are not similarly situated. In *State* v. *Long*, supra, 268 Conn. 535, we assumed, without deciding, that the classes are similarly situated for equal protection purposes. In light of our conclusion in the present case, we need not address the state's argument, and, once again, we assume, arguendo, that the classes are similarly situated.

Connecticut Valley Hospital, and a thirteen page summary that he prepared, which is entitled "Descriptions of [Connecticut Valley Hospital] divisions and units as they relate to criminal and civil commitments . . . ." Having found the defendant's abstract description and supporting documents less than helpful in analyzing the issues on appeal, but mindful of the significant issue presented, we, like the trial court, find ourselves faced with the thorny task of making this abstraction more concrete. After reviewing the defendant's submissions to this court, his submissions to the trial court and the evidence presented to the trial court, we now attempt to do so.

The defendant submitted evidence that, if credited, demonstrates that the system applicable to acquittees, which is subject to oversight by the board and the Superior Court, operates such that the primary concern is the protection of the public, whereas the system applicable to civilly committed inmates, which is subject to oversight by administrators of mental health facilities and the Probate Court, operates such that the primary concern is the committed inmate's liberty interests.[18] That evidence suggests that these different focal

---

[18] It is unclear from the defendant's submissions to what extent he contends that the terms in the statutory schemes, in and of themselves, require longer periods of commitment for acquittees. We note, however, that there are statutory terms that suggest that the legislature has imposed different mandates for the two systems. For acquittees, the legislature has directed the board, in making decisions regarding conditional release, and the Superior Court, in making decisions regarding discharge, to consider "that its primary concern is the protection of society . . . ." General Statutes §§ 17a-584 (a) and 17a-593 (g). In civil commitment proceedings, however, the legislature has directed physicians providing opinions to the Probate Court to consider "whether or not less restrictive placement is recommended and available"; General Statutes § 17a-498 (c); and similarly has required the Probate Court to consider "whether or not a less restrictive placement is available . . . ." General Statutes § 17a-498 (c). We also note that an acquittee can apply for conditional release or discharge no more than once every six months. See General Statutes §§ 17a-588 (b) and 17a-593 (a).

points are manifested in essentially three ways: (1) *Procedures*—the board has a more protracted review process for discharging acquittees, whereas civilly committed inmates are evaluated for release on an ongoing basis; (2) *Substantive Standard*—legal standards for continued commitment are interpreted and applied more conservatively to acquittees; and (3) *Treatment Conditions*—acquittees are committed under more restrictive conditions, as exemplified in the mandatory outpatient treatment under the supervision and control of the board, whereas civilly committed inmates are entitled to treatment in the least restrictive environment, as exemplified in the voluntary outpatient treatment. The defendant contends that, as a result of these differences, the most important variable in determining the length and conditions of commitment is neither clinical prognosis nor the nature of the offense but, rather, which body or decision maker—the board or the Superior Court, on the one hand, or administrators of mental health facilities or the Probate Court, on the other—is overseeing the commitment.

Having clarified the factual underpinnings of the defendant's claim, we next must identify his theory for prevailing on the claim, because it is through this lens that we must consider whether that claim is precluded. In response to the state's argument that the defendant's claim is barred under the doctrine of stare decisis, the defendant underscores that his "analysis of [*Long*] shows that he is neither claiming that [*Long*] is clearly erroneous nor suggesting that this court must overrule [*Long*] in order for him to prevail." The defendant acknowledges that, in connection with review of his first motion to dismiss, he had conceded that rational basis review applied to his federal equal protection claim. See *State* v. *Long*, supra, 268 Conn. 535 ("[i]t is undisputed that § 17a-593 [c] neither affects a suspect group nor implicates a fundamental right for the pur-

poses of the federal equal protection clause . . . and therefore must be analyzed under rational basis review"). He contends, however, that a different, more searching level, or type, of scrutiny should be applied to the claim that he advances in support of his second motion to dismiss. Ultimately, the defendant asserts that, if this court's holding on his federal equal protection challenge in *State* v. *Long*, supra, 537, must be reconsidered "in [l]ight of '[c]hanged [c]onditions' or [u]nder [i]ntermediate [s]crutiny, [t]he [r]ational [b]asis in [*Long*] [n]o [l]onger [a]pplies." Thus, although the defendant does not ask us to overrule *Long*, he seeks to have us apply a legal framework that would yield a result in the present case that would be inconsistent with the reasoning and holding in that case.

Before addressing the defendant's claims, we note that, although the trial court permitted the defendant to present evidence as to the operation and effect of the two systems, it made no factual findings as to those issues. We further note that the defendant's constitutional claim and the state's response that the defendant's claim is precluded raise questions of law over which we exercise plenary review. See *State* v. *Denya*, 294 Conn. 516, 529, 986 A.2d 260 (2010) (plenary review applies to construction of judgments); *Gaynor* v. *Payne*, 261 Conn. 585, 595, 804 A.2d 170 (2002) (plenary review applies to issues regarding application of doctrine of res judicata).

II

"Under the doctrine of res judicata, or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. A judgment is final not only as to every matter [that] was offered to sustain the claim, but also as to any other admissible matter [that] might have

been offered for that purpose."[19] *State* v. *Aillon,* 189 Conn. 416, 423, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983).

"Nonetheless, in applying the doctrine of res judicata to a [criminal] defendant's constitutional claim, special policy considerations must be taken into account. The interest in achieving finality in criminal proceedings must be balanced against the interest in assuring that no individual is deprived of his liberty in violation of his constitutional rights. . . . Whether two claims in a criminal case are the same for the purposes of res judicata should therefore be considered in a practical frame and viewed with an eye to all the circumstances of the proceedings." (Citations omitted; internal quotation marks omitted.) Id., 424–25. Because the "doctrine has dramatic consequences for the party against whom it is applied . . . we should be careful that the effect of the doctrine does not work an injustice." (Internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.,* 282 Conn. 594, 602, 922 A.2d 1073 (2007).

---

[19] "[O]rdinarily the doctrine of res judicata operates to preclude the relitigation in one action of a claim or issue that has been determined in a previous, separate action. . . . This does not mean, however, that the doctrine cannot operate within the same case." (Citations omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury,* 239 Conn. 375, 397, 685 A.2d 1108 (1996), overruled in part on other grounds by *State* v. *Salmon,* 250 Conn. 147, 735 A.2d 333 (1999). "A judgment may be final in a res judicata sense as to a part of an action although litigation continues as to the rest." (Internal quotation marks omitted.) Id.; see, e.g., *State* v. *Aillon,* 189 Conn. 416, 425–29, 456 A.2d 279 (applying doctrine to bar relitigation of defendant's double jeopardy claim, which had been decided against him on somewhat different theory in earlier appeal in same case), cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983); 18A C. Wright et al., Federal Practice and Procedure (2d Ed. 2002) § 4432, p. 63 ("[i]f the appellate court terminates the case by final rulings as to some matters only, preclusion is limited to the matters actually resolved by the appellate court"). The parties agree that res judicata applies to claims actually decided in the first appeal but disagree as to whether it bars theories or facts that could have been but were not raised in that appeal. As we explain in the text of this opinion, we agree with the state that, for purposes of the doctrine of res judicata, the claim in this appeal is the same claim that the defendant had raised in the first appeal in this case.

Although involuntary commitment is not a criminal proceeding, and changed conditions allow for release, "the United States Supreme Court has aptly characterized the involuntary confinement for treatment of mental illness as a 'massive curtailment of liberty.' *Humphrey* v. *Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972); accord *Vitek* v. *Jones*, 445 U.S. 480, 491, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980)." *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 405, 780 A.2d 903 (2001); see also id. ("[a]lthough the *purpose* of an order of commitment issued as a result of an insanity acquittal is significantly different from that of a prison sentence imposed as a result of a criminal conviction . . . the *effect* of such a commitment on the acquittee is no less a deprivation of liberty than that of a prison sentence" [citation omitted; emphasis in original]). In fact, "[t]he United States Supreme Court has recognized involuntary commitment to a mental institution, in particular, as involving more than a loss of freedom from confinement . . . due to its stigmatizing consequences . . . and the potential exposure to invasive, compulsory medical and psychiatric treatment." (Citation omitted; internal quotation marks omitted.) *State* v. *Metz*, supra, 230 Conn. 412–13. We therefore conclude that we should apply the doctrine of res judicata under the more stringent test applied in the criminal context rather than under the broader transactional test that we apply in the civil context. Cf. *Weiss* v. *Weiss*, 297 Conn. 446, 461, 998 A.2d 766 (2010) (setting forth transactional test applied in civil context).

In the criminal context, the doctrine's application "depends on whether the present claim is *sufficiently similar* to the previous claim to warrant [the] giving [of] preclusive effect to the prior judgment. See *State* v. *Aillon*, supra, 189 Conn. 426; *State* v. *Richardson*, 86 Conn. App. 32, 38, 860 A.2d 272 (2004), cert. denied, 273 Conn. 907, 868 A.2d 748, cert. denied, 545 U.S. 1107,

125 S. Ct. 2550, 162 L. Ed. 2d 281 (2005)." (Emphasis added.) *State* v. *Jones*, 98 Conn. App. 695, 704, 911 A.2d 353 (2006), cert. denied, 281 Conn. 916, 917 A.2d 1000 (2007). "[A] slight shift in evidentiary basis and substantive theory of law does not constitute a new claim. . . . That identical grounds for relief may be supported by different factual allegations or different legal arguments or couched in different language renders those grounds no less identical." (Citations omitted.) *State* v. *Aillon*, supra, 426–27.

In the present appeal, the defendant advances the same constitutional claim that he had raised in his first motion to dismiss, that is, continuing an acquittee's commitment under the board's jurisdiction, rather than under the system for civil commitment, violates the equal protection clause of the fourteenth amendment. He relies on the same classes for purposes of that claim. He has identified the same overarching theory, as reflected in the identically worded statements in his first and second motions to dismiss: "[O]nce an acquittee reaches [his] maximum term of recommitment, the reasoning of *Fasulo* v. *Arafeh*, [supra, 173 Conn. 473], *State* v. *Metz*, [supra, 230 Conn. 400], and related cases, by extension, renders a state's petition for recommitment pursuant to . . . [§] 17a-593 (c) unconstitutional in both procedure and effect . . . ." He has sought the same relief.

Contrary to the defendant's view, the trial court's decision on his first motion to dismiss, and in turn this court's review of that decision, was not limited to unequal treatment with respect to mandatory periodic judicial review. The court, *Miano*, *J.*, in its analysis of the defendant's equal protection claim, had cited the lack of such review as one example of disparate treatment and then noted: "There are a variety of ways that the two classes are treated differently by the respective set of applicable statutes, including the procedure used

[in connection with] the original commitment, the manner in which the commitment is reviewed, the manner in which the commitment is extended beyond any maximum term for the offense, the manner of discharge, and the penalties imposed [for] each class should the [committed individual] abscond from [his] respective place of confinement." Similarly, this court, in its decision in the defendant's first appeal, had cited various rights and procedures that distinguished the schemes. *State* v. *Long*, supra, 268 Conn. 519–20, 525–30. This court simply identified the "required biennial judicial review, which is not applicable to acquittees . . . [as] the *principal* distinction in the recommitment processes for civil committees and acquittees." (Emphasis added.) Id., 530. Subsequent cases have construed our holding in *Long* to address the procedures, generally, that distinguish the schemes. See *State* v. *Harris*, supra, 277 Conn. 387 (*Long* "conclud[ed] that although principles of equal protection require that the burdens of proof in continued commitment and civil commitment proceedings be identical, those same principles do not require that the procedures themselves be identical"); *State* v. *Lindo*, 110 Conn. App. 418, 426–27, 955 A.2d 576 (concluding that acquittee's equal protection challenge, which was based on absence of procedural requirements provided under civil scheme of sworn certificates, testimony of two impartial physicians, and three judge panel to determine propriety of commitment, was controlled by *Long*), cert. denied, 289 Conn. 948, 960 A.2d 1038 (2008). In addition, in *Long*, we deemed it constitutionally permissible to vest the board with primary authority to monitor an acquittee's status. See *State* v. *Long*, supra, 536. That conclusion is clearly evidenced by one of the rational bases cited for the disparate treatment, namely, that the board is better equipped than a court to monitor an acquittee's recommitment because of "its expertise and familiarity with the mental status of each acquittee . . . ." Id.

In his second motion to dismiss, a principal thrust of the defendant's claim is the different procedures under the two schemes to obtain release. We cannot discern a meaningful distinction between the effect of those procedures and the ones that we had addressed in the defendant's previous appeal. We are mindful that the defendant also cites standards and conditions of treatment, which are aspects of the scheme that we did not address in our prior decision. For the reasons that follow, we conclude that the defendant is precluded from advancing those aspects of his claim to obtain the relief he seeks.

We first note that the defendant has presented evidence of various aspects of disparate treatment as integrated parts of a whole—a mosaic—and not as separate grounds that independently provide a basis for relief. This court has attempted to categorize the disparate treatment only to make his claim more concrete. Although, arguably, the defendant could reframe his claim and retool his evidence in the event that we were inclined to remand the case to the trial court to afford the defendant a third bite at the apple, there is a more fundamental problem underlying his claim.

The defendant implicitly recognizes that our conclusion in his first appeal that rational basis review applied presents a threshold that he must overcome in order to prevail in this appeal. The defendant, however, expressly disavows any claim that *Long* was improperly decided or that it must be overruled. To surmount that obstacle, the defendant proposes that we apply a different level of scrutiny to his claim in this appeal than the rational basis review that we applied in the previous appeal, asserting that, if we do so, we no longer can rely on that holding to preclude his claim in this appeal. Thus, in effect, he seeks a result that would be inconsistent with our prior decision, albeit without having us overrule that decision. The conflict inherent in this posi-

tion is readily apparent. Because we have no occasion to overrule our prior holding, the defendant cannot proceed under a theory that essentially would achieve that result.

Finally, we note that the defendant argued before the trial court that this court would have reached a different result in his previous appeal if we had been presented with the evidence that the defendant adduced in support of his second motion. That may be the case, but we do not approach the present appeal writing on a blank slate. Significantly, "[n]o valid reason has been alleged as to why the defendant could not have brought the present claim when the prior one was brought." *State* v. *Aillon,* supra, 189 Conn. 427; see also *Kearney* v. *Commissioner of Correction,* 113 Conn. App. 223, 230, 965 A.2d 608 (2009) ("the habeas court properly dismissed the claim alleging ineffective assistance by trial counsel because the claim was based on the same legal ground as [that alleged] in the initial petition, and the petitioner has made no claim that the additional factual allegations contained in the present petition in support of his claim of ineffective assistance of trial counsel represent new facts not reasonably available to him at the time of his initial petition"). Moreover, although the defendant has now brought to our attention case law to support his argument that intermediate scrutiny is the applicable standard, our prior cases clearly indicated that the issue of which level of scrutiny should apply was an open question. See *State* v. *Metz,* supra, 230 Conn. 424 n.17 (declining to determine "whether heightened review would be appropriate in a constitutional analysis of the disparate treatment of acquittees and civil committees"); see also *Fasulo* v. *Arafeh,* supra, 173 Conn. 484–85 (*Bogdanski, J.,* concurring) (addressing equal protection claim that plurality opinion did not reach and asserting that, "when any statutory scheme which significantly affects [involuntary] commitment is

challenged as violative of either the due process or equal protection clauses it ought to be subjected to 'strict judicial scrutiny' "). Some of the courts on which the defendant now relies had established their positions on that issue before the first appeal in this case. See, e.g., *Ernst J.* v. *Stone*, 452 F.3d 186, 200 (2d Cir. 2006) (citing, inter alia, *Francis S.* v. *Stone*, 221 F.3d 100, 111 [2d Cir. 2000], for proposition that intermediate scrutiny is applicable standard of review). Therefore, that issue may be subject to further consideration in another case but not the present one. Accordingly, the trial court properly construed our decision in *State* v. *Long*, supra, 268 Conn. 508, to preclude the defendant's facial challenge to § 17a-593 (c).

### III

The only remaining issue is whether the trial court properly rejected the defendant's as applied equal protection claim. The defendant contends that the trial court misconstrued his claim by drawing a comparison between him as a seriously and persistently mentally ill acquittee and other acquittees whose conditions are not persistent. Because the defendant disavows a claim based on that distinction, we need not consider the merits of the trial court's rejection of that claim. The defendant instead contends that his as applied challenge is one as between him and a similarly situated civilly committed inmate who also is seriously and persistently mentally ill. The defendant cannot prevail on this claim in light of our conclusions in part II of this opinion.

The defendant has provided no basis to distinguish his facial and as applied challenges. Cf. *Ramos* v. *Vernon*, 353 F.3d 171, 174 n.1 (2d Cir. 2003). In the section of his appellate brief explaining why he has made a prima facie case for his as applied challenge, the defendant states: "The trial court actually captured in a nut-

shell a fundamental factual proposition underlying [the defendant's] equal protection argument, i.e., that *all* acquittees under [the board's] jurisdiction have a worse prognosis as far as release is concerned than they would otherwise have under civil commitment." (Emphasis in original.) At oral argument before this court, the defendant conceded that his as applied challenge is effectively a facial challenge because a determination in his favor necessarily would apply to the continued commitment of all other acquittees.

In another constitutional context, "[t]he [United States] Supreme Court has recently explained that [when a party's] claim and the relief that would follow . . . reach beyond the particular circumstances of [that party], the [party] must satisfy [the] standards for a facial challenge to the extent of that reach."[20] (Internal quotation marks omitted.) *Croft* v. *Perry*, 624 F.3d 157, 164 (5th Cir. 2010), quoting *John Doe No. 1* v. *Reed*, 561 U.S. 186, 130 S. Ct. 2811, 2817, 177 L. Ed. 2d 493 (2010). Consequently, the defendant's as applied challenge also

---

[20] We note that the distinction between as applied and facial challenges has perplexed litigants, courts and commentators. See *Citizens United* v. *Federal Election Commission*, 558 U.S. 310, 130 S. Ct. 876, 893–94, 175 L. Ed. 2d 753 (2010) (reflecting debate among plurality, concurring and dissenting opinions as to effect of pleadings on court's ability to address as applied and facial challenges to statutes); *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008) (noting disagreement among members of court as to proper analysis of facial challenge). On one hand, it can refer to the relief sought; on the other hand, it can distinguish the source of the disparate treatment— the text of the statute or those who interpret and apply that text. See generally N. Rosenkranz, "The Subjects of the Constitution," 62 Stan. L. Rev. 1209, 1229–44 (2010) (noting importance that courts attribute to this distinction but questioning accuracy of characterizations). As we previously indicated; see footnote 18 of this opinion; it is unclear to what extent the defendant predicates his claim on disparate treatment on the face of the statutes rather than in practice. Because the defendant characterizes his claim and the relief sought thereunder as a facial challenge to continued commitment under § 17a-593, we have accepted his characterization for purposes of our analysis in part II of this opinion.

is precluded for the reasons set forth in part II of this opinion.

The judgment is affirmed.

In this opinion the other justices concurred.