******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and tecÄical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# JAN G. *v.* COMMISSIONER OF CORRECTION [*]
## (AC 47191)

Elgo, Moll and Clark, Js.

### *Syllabus*

The respondent Commissioner of Correction appealed, on the granting of certification, from the habeas court's judgment granting in part the petitioner's petition for a writ of habeas corpus. The petitioner had previously been convicted of murder and assault of an elderly person in the third degree after an incident in which he consumed a large quantity of cocaine and attacked his parents in their home, killing his father. The respondent claimed, inter alia, that the court improperly concluded that the petitioner's trial counsel, M, had violated the petitioner's sixth amendment right to autonomy to decide the fundamental objectives of his defense, as established in *McCoy* v. *Louisiana* (584 U.S. 414). *Held*:

The habeas court improperly concluded that M violated the petitioner's sixth amendment right to autonomy under *McCoy*, as M honored the petitioner's not guilty plea and did not concede his guilt at his criminal trial and, thus, *McCoy* was inapplicable to the petitioner's claim, and this court declined to extend the holding of *McCoy* to conclude that M, by raising a defense of extreme emotional distress on the petitioner's behalf, had conceded his guilt.

The habeas court improperly concluded that M rendered ineffective assistance by failing to raise a defense of mental disease or defect at the petitioner's criminal trial, as M's decision to forgo that defense was a reasonable trial strategy based on the information available to him at the time he made it and, thus, the petitioner did not satisfy his burden of demonstrating that M's performance was constitutionally deficient.

Argued June 4, 2025—officially released January 13, 2026

### *Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment granting the petition in part and denying the petition in part, from which

---

[*] In accordance with our policy of protecting the privacy interests of victims of family violence, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

the respondent, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*.

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *Christian M. Watson*, state's attorney, *Angela R. Macchiarulo*, supervisory assistant state's attorney, and *Michael J. Proto*, senior assistant state's attorney, for the appellant (respondent).

*Naomi T. Fetterman*, assigned counsel, with whom, on the brief, was *James E. Mortimer*, assigned counsel, for the appellee (petitioner).

*Opinion*

ELGO, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part and denying in part the amended petition for a writ of habeas corpus filed by the petitioner, Jan G. On appeal, the respondent claims that the court improperly concluded that the petitioner's criminal trial counsel, Attorney Michael Isko, (1) violated the petitioner's sixth amendment right to autonomy to decide the fundamental objectives of his defense, as established in *McCoy* v. *Louisiana*, 584 U.S. 414, 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018), and (2) rendered ineffective assistance of counsel by pursuing a defense of extreme emotional disturbance (EED), rather than the petitioner's preferred defense of demonic possession or a lack of capacity due to mental disease or defect. We agree and, accordingly, reverse in part the judgment of the habeas court.

The following facts underlying the petitioner's criminal conviction were set forth in his direct appeal. "The [petitioner] lived in the first floor apartment of a two-family home. His ninety year old father and seventy-four year old mother lived in the second floor apartment.

"On October 13, 2011, the [petitioner] consumed a large quantity of cocaine. Thereafter, in the early morning hours of October 14, 2011, the [petitioner] entered his parents' apartment and punched his mother in the face. The punch knocked out one of his mother's upper

front teeth, cut her lip, and caused swelling and bruising extending from her left eye to the bridge of her nose. After assaulting his mother, the [petitioner] armed himself with an ornamental sword from his apartment and knives from his parents' kitchen. With these weapons, he proceeded to attack and kill his father.

"In this attack, the [petitioner] gouged out the father's left eye, broke his nose, slit his neck twice, and forced the handle of a potato masher down his throat. The [petitioner] also amputated his father's penis and ate it. In all, the autopsy subsequently performed on the father's body revealed approximately seventy-six sharp force wounds.

"As the [petitioner] attacked his father, his mother ran for help. When the police officers entered the first floor apartment, they found the [petitioner] seated on his couch, using his computer, naked from the waist down, and covered in blood. The [petitioner] was sweating, and it appeared to the officers that he was under the influence of some type of illicit drug. Nevertheless, the officers observed that he also appeared to understand what was being said to him. The officers discovered the lifeless body of the [petitioner's] father on the floor of the second floor apartment. He was pronounced dead at the scene. The [petitioner] was arrested.

"After his arrest, the [petitioner] tested positive for cocaine and opiates. Both in his apartment and in the hospital on October 14, 2011, the [petitioner] asserted that he was Satan. Specifically, the [petitioner] stated the following to the officers in his apartment shortly after his arrest: 'I am Satan. I made a pact with your earth and you did not keep your end of the deal. I order you to release me and take these cuffs off . . . .' Even though the [petitioner] identified himself as Satan at times, at other points during his interactions with the police that evening he also referred to himself by his real name. At the police department later that day, the [petitioner] told officers 'that it was the drugs . . . crack

and cocaine.' The [petitioner] then asked: 'What do you think I'll get? Ten, twenty years?'

"The state charged the [petitioner] with one count of murder in violation of [General Statutes] § 53a-54a (a) and one count of assault of an elderly person in the third degree in violation of [General Statutes] § 53a-61a (a) (1). The [petitioner] pleaded not guilty to these charges, elected a jury trial, and was found competent to stand trial.

"At trial, the defense introduced the testimony of Alec Buchanan, a forensic psychiatrist, who conducted a psychiatric evaluation of the [petitioner] while he was awaiting trial. Buchanan explained that the [petitioner] told him that he began to use cocaine in 2008, developed an interest in Satanism shortly thereafter, and believed Satan took over his body to perpetrate the crimes against his parents. Buchanan also acknowledged that the onset of the [petitioner's] symptoms coincided with his cocaine dependence and that the symptoms resolved when he no longer had access to cocaine.

"Following Buchanan's testimony, defense counsel requested time to discuss with the [petitioner] whether he would testify on his own behalf. The trial court granted that request and permitted a recess. When the trial resumed two days later, defense counsel informed the trial court, outside the presence of the jury, that the [petitioner] was asserting his right to testify.

"The trial court then canvassed the [petitioner] on his decision to testify. After this canvass, defense counsel requested that the [petitioner's] testimony proceed in a narrative format. When the trial court asked why, defense counsel specified that his request was not based on rule 3.3 of the Rules of Professional Conduct,[1] but 'on other parts of the rule[s] . . . .' The state did not

---

[1] "Rule 3.3 (a) of the Rules of Professional Conduct provides in relevant part: 'A lawyer shall not knowingly . . . (3) [o]ffer evidence that the lawyer knows to be false . . . .'" *State* v. *Jan G.*, 329 Conn. 465, 470 n.2, 186 A.3d 1132 (2018).

object to this request, provided it could object during the [petitioner's] testimony and conduct cross-examination.

"Accordingly, the trial court proceeded to canvass the [petitioner] a second time. This canvass focused specifically on the [petitioner's] decision to testify in narrative form. The trial court explained to the [petitioner] that his testimony would be in a different format than the testimony of other witnesses and that the court would instruct the jury not to speculate as to why the [petitioner] was testifying in narrative form. The trial court then warned the [petitioner] that his attorney might not be 'effective in representing' him during the narrative testimony. The trial court then asked the [petitioner] if he still wished to testify in narrative form, and the [petitioner] confirmed that he did.

"After the trial court completed this second canvass, the jury entered the courtroom. The trial court instructed the jury that the [petitioner] would testify in a 'somewhat partial narrative form . . . .' After the [petitioner] took the stand, defense counsel inquired about the [petitioner's] name, age, and schooling, and then asked the [petitioner] broadly 'about [October 14, 2011] and [the] events leading up to October 14, 2011 . . . .' The [petitioner] then testified, in narrative form, that his drug use led to an interest in Satanism and that, on October 14, 2011, after taking drugs the evening before, he was possessed by Satan. He told the jury that Satan took his body to his parents' apartment and killed his father. The state then cross-examined the [petitioner]. Following cross-examination, defense counsel conducted a brief redirect examination of the [petitioner]. After redirect, defense counsel rested the [petitioner's] case, and, after the state called a rebuttal witness, defense counsel presented closing argument to the jury.

"Ultimately, the jury returned a verdict of guilty on both counts. The trial court rendered judgment in accordance with the jury's verdict and sentenced the [petitioner] to sixty years of imprisonment. Thereafter, defense counsel filed a motion for a new trial, which

was denied." (Footnote in original; footnote omitted.) *State* v. *Jan G.*, 329 Conn. 465, 468–71, 186 A.3d 1132 (2018). Our Supreme Court subsequently affirmed the petitioner's judgment of conviction on direct appeal. Id., 484.

The petitioner commenced this habeas corpus action in 2018. In his operative petition, i.e., his October 5, 2021 amended petition, the petitioner alleged eight counts sounding in ineffective assistance of counsel on the part of Isko (counts one, three, five, and eight through twelve);[2] two counts of ineffective assistance of counsel on the part of his criminal appellate counsel, Attorney Emily Wagner (counts four and six); and two counts alleging that the trial court erred by failing to canvass him with respect to his decision to elect a jury trial and by "allow[ing] [his] attorney to continue to represent him" (counts two and seven). The court denied the petition on counts one, two, three, four, and twelve. The court's denial of these counts is not at issue on appeal.

At the petitioner's habeas trial, the court heard testimony from the petitioner, Isko, Wagner, Buchanan, psychologist Madelon Baranoski, and Attorney Robert McKay. The petitioner introduced fifteen exhibits into evidence—thirteen transcripts from the petitioner's underlying criminal trial and two psychological evaluations prepared by Buchanan and Baranoski, respectively.

In his report, which the court credited, Buchanan concluded that the petitioner suffered from "schizotypal personality disorder, poly-substance dependence and a psychotic illness" and that "[a]ll [were] recognized forms of mental disorder and . . . seem to amount to mental disease or defect." Buchanan stated that he "did not consider that [the petitioner's] symptoms and signs prevented him from appreciating the wrongfulness of his conduct. [The petitioner] described to me being aware at points during the killing that what he was doing was wrong,

---

[2] Three counts of ineffective assistance of counsel (counts nine, ten, and eleven) directed against Isko were withdrawn after the close of evidence.

and against the law." In addition, Baranoski concluded that the petitioner "was not malingering; he had average IQ; he met the criteria for schizotypal personality disorder and suffered from depression; and he did not have a primary psychotic disorder."

It is undisputed that Isko received copies of both Buchanan's report and Baranoski's report prior to the petitioner's criminal trial. At the habeas trial, Isko testified that he concluded, in light of those reports, that the petitioner's criminal actions resulted from a "drug fueled rage" and that he had an "extremely emotional response" to the drugs. Isko testified that the petitioner had "schizotypal personality disorder" and "disordered thinking." Isko testified that, on the basis of his understanding of both Buchanan's and Baranoski's reports, he did not believe that the petitioner's diagnosis prevented the petitioner from appreciating the wrongfulness of his actions. Isko explained that it was his understanding that the petitioner was not "cognitively incapacitated" nor "psychotic," but rather that the petitioner had the "capacity" to commit the charged crimes. Specifically, Isko testified that the petitioner's psychological evaluation "did not rise to the level of an insanity case where he could not understand his actions or could not conform his actions to the law."[3] Isko testified that he thought

---

[3] The mental disease or defect defense is memorialized in General Statutes § 53a-13 (a), which provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

That defense is not available if a defendant's "mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof . . . ." General Statutes § 53a-13 (b) (1).

Although § 53a-13 has been amended by the legislature since the events underlying this case; see, e.g., Public Acts 2019, No. 19-27; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

the EED defense[4] was the "strongest" defense and, for that reason, he had Buchanan testify in support of that defense at the petitioner's criminal trial.

In explaining his decision to pursue an EED defense over a mental disease or defect defense, Isko referenced Baranoski's report and testified that Baranoski "did not find that there was a psychotic illness specifically" but, rather, found a "schizotypal personality disorder," which was "really problematic." Isko also testified that he believed that the petitioner's admitted cocaine use on October 13, 2011, largely precluded the petitioner from raising a mental disease or defect defense at his criminal trial. See footnote 3 of this opinion.

Regarding the petitioner's preferred line of defense, Isko testified: "[The petitioner] felt strongly that . . . the devil did it. He was possessed by the devil. [The devil] [t]ook over his body and actually did the crime." Isko explained that, prior to the petitioner's criminal trial, he spoke to a clergy member, who stated that his church would not get involved, post hoc, to support a demonic possession defense. Isko also spoke with Attorney Martin Minnella, who previously had attempted to raise a demonic possession defense in Connecticut. Isko testified that demonic possession was "not a cognizable defense." Isko further stated that, because the petitioner wanted to raise a noncognizable defense, it would be "unethical" for him to do so, and he therefore asked the trial court

_____

[4] The EED defense is set forth in General Statutes § 53a-54a (a), which provides in relevant part: "[I]t shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ."

As our Supreme Court has explained, the EED defense has two elements: "(1) the defendant committed the offense under the influence of extreme emotional disturbance; and (2) there was a reasonable explanation or excuse for the defendant's extreme emotional disturbance." (Internal quotation marks omitted.) *State* v. *Parris*, 352 Conn. 652, 668, 338 A.3d 1139 (2025).

to allow the petitioner to testify in narrative format at his criminal trial.[5]

At the petitioner's habeas trial, Buchanan testified that the petitioner could "control his behavior" only insofar as the petitioner could "carry out complicated actions, but the reasons are not logical and are the product of mental illness" and, hence, the petitioner's ability "to conform his actions to the law is substantially affected by his mental illness." Buchanan also testified that he "did not believe [the petitioner] could conform his behavior to the requirements of the law." Buchanan stated that he did "consider [the petitioner's] psychiatric symptoms and signs impaired his ability to control his conduct" and that "the reasons that led to the petitioner's behavior in killing his father, however, were the product of his psychotic illness."[6]

The petitioner also testified at the habeas hearing. He stated that, at the time of his criminal trial, Isko "was

_____

[5] At the petitioner's criminal trial, Isko did not reference any specific rule in the Rules of Professional Conduct when requesting permission for the petitioner to testify in "narrative form" regarding his demonic possession defense. Isko stated that his request was based on "other parts of the . . . Rules of Professional Conduct." In acting on that request, the trial court referenced rule 3.3 of the Rules of Professional Conduct, which provides in relevant part: "(a) A lawyer shall not knowingly: (1) Make a false statement of fact or law to a tribunal . . . or (3) Offer evidence that the lawyer knows to be false. . . ." There is no authority that supports demonic possession as a defense in Connecticut.

[6] Buchanan's habeas testimony in this regard somewhat contradicts his testimony at the petitioner's criminal trial. At the criminal trial, Buchanan testified that the petitioner "remembered attacking his father with both a sword" and a "knife"; that he recognized "the wrongfulness" of his conduct and felt "resistance" to doing it; that he "recognized the moral wrongfulness of his actions" and their illegality; and that his "objective in attacking his father" was "to kill" him. Buchanan also testified that the petitioner "was conscious and acted for reasons and to that extent, [the petitioner] was able to control his behavior." In addition, Buchanan linked the petitioner's psychosis to his cocaine use by noting that the "onset of [the petitioner's] symptoms follow the reinstatement of his cocaine dependence" and that the petitioner's symptoms resolved "when he no longer had access to cocaine," which "suggests that cocaine use was an important factor" in the petitioner's psychosis.

pushing" the defense of EED on him despite his protests.[7] The petitioner testified that he knew that a demonic possession defense was not recognized in Connecticut. The petitioner also testified that he understood that the only relief that could be afforded to him by the habeas court was a retrial and, if that retrial were to occur, Connecticut courts would still not recognize the demonic possession defense.[8]

In its memorandum of decision, the habeas court concluded that Isko violated the petitioner's sixth amendment autonomy rights, as established in *McCoy*, by pursuing an EED defense against the petitioner's "vociferous objection" insofar as the defense infringed upon the petitioner's rights to determine the objectives of his defense. Additionally, the court found that Isko rendered ineffective assistance of counsel by failing to raise a mental disease or defect defense at trial.[9] The court denied in part the operative petition with respect to counts one, two, three, four, and twelve. The court granted in part the operative petition with respect to counts five, six, seven, and eight and thereafter granted the respondent's petition for certification to appeal. This appeal followed. The court's denials of counts one, two, three, four, and twelve are not before us on appeal.

---

[7] The petitioner testified that the EED defense was "not the defense I want[ed] and I [said], I'm innocent, it wasn't me that did this, it was the devil. I was possessed, and I wanted a demonic possession defense."

[8] Notably absent from the petitioner's testimony is any mention of the mental disease or defect defense. At his habeas trial, the petitioner maintained that the devil possessed him and that the demonic possession defense was his preferred defense. The record of the petitioner's criminal trial unequivocally reflects that the petitioner did present his demonic possession defense to the jury, albeit not as his main defense strategy.

[9] In its decision, the court found that Buchanan believed the petitioner "met the criteria of medical disease or defect" because "his behavior was not just a side effect of the medications; he had [an] independent psychotic illness and the substances on their own did not explain the symptoms or behaviors but may have contributed to them." The court further found that "[s]ome of the mental illnesses may have been caused by the drugs and [Buchanan] believes that the drugs contributed to the development of the psychosis." The court nevertheless found that the petitioner's drug use was not "sufficient to explain all aspects of his mental illness."

Rather, the only issues on appeal are the respondent's claims that the court improperly concluded that Isko both violated the petitioner's sixth amendment right to autonomy and rendered ineffective assistance of counsel by failing to raise a mental disease or defect defense.[10]

At the outset, we note that a habeas court's factual findings will be upheld unless they are clearly erroneous. *See Grant* v. *Commissioner of Correction*, 345 Conn. 683, 694, 287 A.3d 124 (2022); *Santaniello* v. *Commissioner of Correction*, 230 Conn. App. 741, 750, 331 A.3d 739, cert. denied, 351 Conn. 926, 333 A.3d 1109 (2025). The "application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Santaniello* v. *Commissioner of Correction*, supra, 746.

I

The respondent claims that, with respect to counts five, six, and seven, the court improperly concluded that Isko violated the petitioner's sixth amendment right to autonomy. He argues that the precedent set forth in *McCoy* v. *Louisiana*, supra, 584 U.S. 414, is "wholly inapplicable" to the petitioner's case because Isko never conceded his client's guilt in the petitioner's criminal trial. We agree.

Under the sixth and fourteenth amendments to the United States constitution, "a defendant has the right to insist that counsel refrain from admitting guilt . . . ." *McCoy* v. *Louisiana*, supra, 584 U.S. 417. In *McCoy*, the United States Supreme Court held that "counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission." Id., 426. The court explained that asserting innocence

---

[10] The respondent alternatively argues that, notwithstanding pleading deficiencies and procedural default on the part of the petitioner, the habeas court improperly found in the petitioner's favor on counts five and seven of the operative petition. In light of our resolution of the respondent's principal claims, we need not address those alternative contentions.

is akin to the other "fundamental decisions" a client is entitled to make regarding her case. (Internal quotation marks omitted.) Id., 420. In so doing, the court stated: "Autonomy to decide that the objective of the defense is to assert innocence belongs in this [reserved for the client] category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." (Emphasis in original.) Id., 422; see also *Jones* v. *Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) ("[i]t is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal").

Although *McCoy* was a death penalty case, it applies to all criminal proceedings in this state. See *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 697 n.7 (referencing *McCoy* and stating that "[i]t is axiomatic that the sixth amendment applies to *all* criminal prosecutions and that the rights secured thereunder do not turn on the severity of the potential punishment for an offense" (emphasis in original)).

The particular facts of *McCoy* inform our analysis in the present case. In *McCoy*, the defendant, Robert Leroy McCoy, was charged with murdering three people. *McCoy* v. *Louisiana*, supra, 584 U.S. 418. McCoy pleaded not guilty and "insistently maintained that he was out of [s]tate at the time of the killings and that corrupt police killed the victims when a drug deal went wrong." Id. After dismissing his first assigned counsel, his second counsel, Attorney Larry English, "eventually concluded that the evidence against McCoy was overwhelming and that, absent a concession at the guilt stage that McCoy

was the killer, a death sentence would be impossible to avoid at the penalty phase." Id.

Prior to trial, English and McCoy disagreed about whether to pursue a concession strategy. Id., 419. McCoy requested new counsel, and his request was denied. Id. In his opening statement at trial, English conceded to the jury that "'my client committed three murders.'" Id., 420. McCoy testified at trial to a "difficult to fathom" alibi defense, asserting his innocence. Id. In his closing argument, English "reiterated that McCoy was the killer" and "told the jury that he 'took [the] burden off of [the prosecutor].'" Id. The jury then returned a verdict of guilty. Id. At the penalty phase, English again conceded that McCoy was the murderer and "urged mercy in view of McCoy's 'serious mental and emotional issues' . . . ." Id. Under these facts, the United States Supreme Court held that such admissions of guilt over the objections of a criminal defendant violate the defendant's sixth amendment autonomy rights. Id., 422–23.

In recognizing a criminal defendant's right to autonomy, the court emphasized the distinction between trial management and trial objectives. As the court stated, "[t]rial management is the lawyer's province . . . ." Id., 422; see also *Gonzalez* v. *United States*, 553 U.S. 242, 249, 128 S. Ct. 1765, 170 L. Ed. 2d 616 (2008) ("Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial. These matters can be difficult to explain to a layperson; and to require in all instances that they be approved by the client could risk compromising the efficiencies and fairness that the trial process is designed to promote."). *McCoy* illuminates the balance between trial objectives and strategy and clarifies that issues of trial objectives are reserved for the client, while issues of trial strategies are reserved for counsel. *McCoy* v. *Louisiana*, supra, 584 U.S. 422;

see also *Gonzalez* v. *United States*, supra, 249 ("[g]iving the attorney control of trial management matters is a practical necessity"); *Meletrich* v. *Commissioner of Correction*, 332 Conn. 615, 627, 212 A.3d 678 (2019) ("[i]t is axiomatic that decisions of trial strategy and tactics rest with the attorney" (internal quotation marks omitted)).

In construing *McCoy*, our Supreme Court has stated that "the sixth amendment right to autonomy is implicated only when, over a defendant's express objections, counsel concedes the defendant's guilt to a charged offense." *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 698. The United States Court of Appeals for the Second Circuit has similarly interpreted *McCoy* and observed that "*McCoy* is limited to a defendant's right to maintain his innocence of the charged crimes." *United States v. Rosemond*, 958 F.3d 111, 123 (2d Cir. 2020), cert. denied,    U.S.    , 141 S. Ct. 1057, 208 L. Ed. 2d 524 (2021).

Significantly, and unlike defense counsel in *McCoy*, Isko in the present case never admitted the petitioner's guilt to the jury. It is undisputed that, at the petitioner's criminal trial, Isko argued that the jury should find the petitioner "not guilty" of both murder and manslaughter charges. Isko argued that, on the night of the murder, the petitioner "was experiencing a psychosis" with "delusions"; "voices"; a "sense of having to obey"; and "general disorganized behavior which overbore his will." Isko also asked the trial court to include jury instructions regarding the petitioner's intoxication at the time of the event, which would "interfere with his ability to form intent in any way." Specifically, Isko characterized this as a "defense to the intent element" of the murder charge. Isko thus pursued a strategy that, had it been successful, would have either led to acquittal by pursuing a not guilty verdict, or, if the jury was persuaded by the petitioner's EED defense, to a lesser sentence pursuant to a manslaughter conviction. By contrast, English's statements to the jury in *McCoy* went so far as to relieve the state of the burden of proof in hopes of

avoiding the death penalty. See *McCoy* v. *Louisiana*, supra, 584 U.S. 420.

In addition, we note that the trial court's jury instructions in the present case incorporated Isko's requests and required the jury to consider an EED defense only upon a finding of guilt to the underlying murder charge.[11] The trial court also instructed the jury on intoxication, noting that intoxication "is not a defense to or an excuse for the commission of a crime" but, rather, may "negate an element of the crime charged, such as intent." The court provided the jury with this instruction on the intent element for both the petitioner's charged crimes of murder and assault of an elderly person in the third degree.

Further, McCoy's testimony in his criminal trial was unlike the petitioner's testimony in his criminal trial. Whereas McCoy testified to his alibi defense, which completely contradicted his attorney's statements to the jury, the petitioner fully admitted to the jury that he committed the charged offenses.[12] At his criminal trial, Isko did not contradict the petitioner's testimony; he attempted to explain it and frame it into a legally cognizable defense. Nothing in *McCoy* or its progeny suggests that its holding should be expanded to require a criminal

---

[11] The jury instructions stated in relevant part: "[F]or you to find the [petitioner] guilty of murder, the state must prove beyond a reasonable doubt the following elements: one, that the [petitioner] had the specific intent to cause the death of [the petitioner's father]; and two, acting with that intent, he caused the death of [the petitioner's father].

"If you unanimously find that the state has proven these two elements of the crime of murder beyond a reasonable doubt, then you must next consider the defense of [EED] . . . ."

[12] On appeal, the petitioner argues that he "is factually innocent because Satan inhabited his body and performed the charged acts. It was not the petitioner's body that committed the offenses but Satan, in corporeal form. The petitioner is thus innocent." Without engaging in the metaphysics, we simply note that the record before us plainly indicates that both the petitioner and Isko attempted to negate the intent element of murder at his criminal trial, as evidenced by the petitioner's criminal trial testimony and Isko's defense strategy. Moreover, implicit in the petitioner's statements in his appellate brief is the concession that the petitioner engaged in the physical conduct proscribed by the criminal statutes under which he was charged.

defense attorney to ignore his client's own admissions of guilt to the jury in pursuit of a noncognizable defense.

Our reluctance to engage in an expansive reading of *McCoy* is further supported by other bedrock principles of criminal law—notably, that a defense counsel may pursue multiple, inconsistent defenses. See, e.g., *State* v. *Nathan J.*, 294 Conn. 243, 262, 982 A.2d 1067 (2009) ("it is axiomatic that a defendant may present inconsistent defenses to the jury"); *Morales* v. *Commissioner of Correction*, 220 Conn. App. 285, 306, 298 A.3d 636 (noting that it is well established that defense attorneys may pursue inconsistent defenses), cert. denied, 348 Conn. 915, 303 A.3d 603 (2023); *Jackson* v. *Commissioner of Correction*, 129 Conn. App. 325, 330, 20 A.3d 75 (affirming habeas court's conclusion that "there is no problem with [defense counsel] presenting inconsistent and alternative theories of defense" (internal quotation marks omitted)), cert. denied, 302 Conn. 947, 31 A.3d 382 (2011). In the present case, Isko did just that by both assisting the petitioner in entering a plea of not guilty and pursuing such a theory at trial while alternatively presenting a mitigation defense of EED.

Moreover, this court has said that "[a] defendant does not concede the elements of murder by advancing an affirmative defense of mental disease or defect, or [EED]." *Zachs* v. *Commissioner of Correction*, 205 Conn. App. 243, 260, 257 A.3d 423 (2021). To conclude otherwise would suggest that raising such an affirmative defense absolves the state of its constitutional burden to establish the elements of the charged crime beyond a reasonable doubt, which is not the case. See, e.g., *Patterson* v. *New York*, 432 U.S. 197, 214, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977) ("a [s]tate must prove every ingredient of an offense beyond a reasonable doubt, and . . . it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense"); *State* v. *Joyner*, 225 Conn. 450, 458, 625 A.2d 791 (1993) ("[a]s a matter of federal constitutional law, although due process requires the state to

prove every element of its case beyond a reasonable doubt . . . a defendant's sanity is not an element of the state's case, so that the state need not bear the burden of proof on that issue" (citations omitted)); *State* v. *Stepney*, 181 Conn. 268, 275–76, 435 A.2d 701 (1980) ("[i]t has been firmly established . . . that a presumption [shifting the burden to the defendant to prove that he lacked the requisite mental state] deprives a defendant of his right to due process of law, which places the burden on the state to prove the existence of every element of the crime beyond a reasonable doubt"), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981); *State* v. *Marrero*, 66 Conn. App. 709, 717, 785 A.2d 1198 (2001) ("[a] state may, however, place the burden of establishing an affirmative defense, by a preponderance of the evidence, on a defendant, as long as the state is not incidentally relieved of its burden of proof for the elements of the crime"). Even in the present case, the habeas court recognized that, "in order to be successful in [a mental disease or defect] defense, the jury would have to first find [the petitioner] guilty, just as they would have to for the EED defense." To extend the holding of *McCoy* more broadly, as the petitioner proposes, effectively asks this court to conclude that Isko, by raising an EED defense on behalf of the petitioner, conceded his client's guilt, thereby relieving the state of its burden of proof to demonstrate his guilt. We decline to do so.[13]

The petitioner nonetheless urges this court to conclude otherwise and relies on the reasoning of the United States

---

[13] If we were to accept the plaintiff's contention, it would place defense attorneys in an untenable position, as illustrated by the habeas court's decision in the present case. Here, the court found that Isko both violated the petitioner's sixth amendment autonomy right by raising an affirmative defense of EED and violated the petitioner's sixth amendment right to effective assistance of counsel by failing to raise an affirmative defense of mental disease or defect. The court's ruling suggests that there was no way for Isko to avoid violating the petitioner's sixth amendment rights by either pursuing a cognizable defense in violation of his right to autonomy or forgoing a cognizable defense in violation of his right to effective assistance of counsel.

We are also mindful of the unique position Isko was in when the petitioner took the stand at his criminal trial and admitted—notwithstanding

Court of Appeals for the Ninth Circuit in *United States* v. *Read*, 918 F.3d 712 (9th Cir. 2019). In *Read*, the court held that, "under the facts of this case," *McCoy* required a criminal defendant's "demand that counsel not present an insanity defense . . . be honored." (Citation omitted.) Id., 715. While serving a sentence for an unrelated crime, the defendant in *Read* "stabbed his cellmate thirteen times" and claimed that "he had no memory of the attack." Id. The defendant subsequently was diagnosed with "schizophrenia" on the basis of his "delusional thoughts regarding Christianity, Satan, and demonization." Id. After psychologists debated his competency, the defendant was determined to be competent, and his defense counsel decided to pursue an insanity defense. Id., 715–16. The defendant elected to proceed in a self-represented capacity and to pursue a demonic possession defense. Id., 716. After standby counsel had been appointed, that counsel raised the concern that the defendant may not be able to distinguish between the demonic possession defense and a mental disease or defect defense. Id., 717. Standby counsel told the court that, if reappointed, counsel "would present an insanity defense" even though "the very reason that [the defendant] had wanted to proceed pro se in the first place was because he did not want an insanity defense." Id. The court reappointed standby counsel to act as the defendant's counsel, thereby terminating his self-representation. Id., 717–19.

his metaphysical arguments—that he "went upstairs and killed [his] father." The petitioner further admitted on cross-examination that his hands attacked his father; that he knew these acts were "illegal" and "morally wrong"; and that he was aware that he had perpetrated these acts on his parents. In that situation, the petitioner's interpretation of the law would have required Isko to ignore the petitioner's own testimony and to advance a noncognizable defense. To the extent that the petitioner submits that criminal defendants have control over both trial objectives and strategies, that contention is contrary to established law. See *McCoy* v. *Louisiana*, supra, 584 U.S. 422; *Gonzalez* v. *United States*, supra, 553 U.S. 249; *Meletrich* v. *Commissioner of Correction*, supra, 332 Conn. 627.

Counsel thereafter unsuccessfully pursued an insanity defense.[14] Id., 717.

On appeal, the defendant claimed that the court violated his sixth amendment "right to present a defense of his own choosing . . . ." Id., 719. In analyzing that claim, the Ninth Circuit noted that "[t]he trial judge here undoubtedly faced a difficult dilemma: whether to permit a defendant, competent and allowed self-representation but clearly mentally ill, to eschew a plausible defense of insanity in favor of one based in delusion and certain to fail." Id. The court ultimately concluded that the trial court had violated the defendant's right to autonomy "to determine the 'objectives' of a defense . . . ." Id., 720. In so doing, the court emphasized that "pleading insanity has grave, personal implications that are separate from its functional equivalence to a guilty plea." Id., 721. Notably, the court stated that a defendant may wish to avoid "contradicting his own deeply personal belief that he is sane, as well as to avoid the risk of confinement in a mental institution and the social stigma associated with an assertion or adjudication of insanity . . . ."[15]

[14] The insanity defense pursued by counsel in *Read* is memorialized in title 18 of the United States Code, § 17, which provides in relevant part: "(a) It is an affirmative defense to a prosecution under any [f]ederal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense. . . ." . Connecticut's counterpart is codified at § 53a-13. See footnote 3 of this opinion.

[15] Criminal defendants who are found not guilty by reason of mental disease or defect may be subjected to confinement in a mental institution. See General Statutes § 17a-582 (a); see also General Statutes § 17a-593 (c) ("[i]f reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney . . . may petition the court for an order of continued commitment of the acquittee"); *State* v. *Long*, 301 Conn. 216, 229–30, 19 A.3d 1242 (In describing the defendant's twenty-two year confinement in a mental institution following a verdict of not guilty by reason of mental disease or defect and, quoting the trial court, our Supreme Court noted that, "[b]arring a miracle, no significant improvement in

Id. The court concluded that such considerations "go beyond mere trial tactics and so must be left with the defendant." Id.

The present case is factually distinguishable from *Read*. Here, Isko did not raise a mental disease or defect defense against the petitioner's wishes. Unlike the defendant in *Read*, the petitioner was not subject to the "social stigma" or the risk of "confinement in a mental institution" if the EED defense that Isko pursued at trial had been successful. Id., 721. Further, nothing in the record suggests that a defense of EED contradicted the petitioner's "deeply personal belief that he is sane . . . ."[16] Id. Ironically, the petitioner's insistence that he was sane tends to contradict his reliance on *Read*. Had Isko pursued the mental disease or defect defense as the petitioner espouses now, the petitioner would have had more basis under *Read* to pursue an ineffective assistance claim.

Further, if the court's premise were correct that *McCoy*'s right to autonomy applied in the context of this case, the petitioner's insistence on his Satanic possession defense necessarily invites speculation as to how Isko would have been able to secure his agreement to

his mental condition [is to] be expected. This means, as a practical matter . . . he is likely to be held in the custody of the [Psychiatric Security Review] [B]oard for the rest of his days. If, however, he were treated as a civil committee, he would likely, given the approach currently used by modern health authorities with authority over civil committees, be transitioned into the community within a relatively short time, perhaps a matter of months." (Internal quotation marks omitted.)), cert. denied, 565 U.S. 1084, 132 S. Ct. 827, 181 L. Ed. 2d 535 (2011).

[16] At the habeas trial, the petitioner testified adamantly about his desire to pursue a demonic possession defense at his criminal trial. The petitioner made no reference to the mental disease or defect defense in his habeas testimony. Moreover, Buchanan testified at the petitioner's criminal trial that the petitioner had "been very reluctant to accept an explanation in terms of mental illness. . . . He prefers to explain what happened in terms of the influence on him of the devil." Buchanan also testified that the petitioner "has not come across as a man who's trying to present himself as mentally ill" and that the petitioner did not agree with Buchanan's assessment of his mental illness.

pursue a mental disease or defect defense.[17] The habeas court characterized the petitioner's Satanic possession defense as a "red herring" to the petitioner's ultimate trial objective of "innocence." The court's conclusion, however, that Isko conceded his client's guilt by pursuing an EED defense is contradicted by the undisputed fact that Isko argued for the petitioner to be found "not guilty." Moreover, the court recognized that, regardless of whether Isko pursued an EED or mental disease or defect defense, it remains the state's burden to prove the elements of the charged offense.[18] Put differently, these defenses are predicated on a jury's finding the elements of murder but, if established, operate to mitigate culpability on the basis of either a mental disease or defect or an extreme emotional disturbance; these defenses are not premised on counsel's concessions of guilt. Further, the petitioner seemingly disagrees with the habeas court's reasoning by arguing that the "objective of petitioner's chosen defense was obvious—the petitioner did not kill his father, Satan did." See also footnotes 7, 8, and 12 of this opinion. In minimizing the petitioner's relentless insistence of a Satanic possession defense, the court failed to reconcile how Isko could present a cognizable defense of "innocence" through the lens of demonic possession.[19] Isko's EED defense may have been the only way

[17] Notably, the habeas court, in concluding that Isko violated the petitioner's right to the effective assistance of counsel for failing to raise a mental disease or defect defense, acknowledged that "this court has no occasion to determine whether, had [Isko] pursued that defense, would [the petitioner] have objected and if he had objected, would pursuing it nonetheless have violated his right to autonomy. To do so would require impermissible speculation on the court's part."

[18] Specifically, the court noted, while simultaneously finding that Isko had admitted the petitioner's guilt in raising an EED defense, that it "recognizes that in order to be successful in [the mental disease or defect defense], the jury would have to first find [the petitioner] guilty, just as they would have to for the EED defense. This would seem contrary to [the petitioner's] other claim that Isko violated his right to autonomy. However, the defense of mental disease or defect was never raised and therefore the decision to pursue that obviously cannot be challenged."

[19] The petitioner and the court wrestled with this very problem in the habeas trial, as the court noted it would not admit certain expert testimony for the petitioner's now withdrawn claim of third-party

to get into evidence the very defense that the petitioner actually wanted to pursue, through the petitioner's own testimony and Buchanan's testimony that the petitioner had a deeply held personal belief that he was, in fact, possessed by Satan.[20] Such speculation, however, has no proper place in our analysis. See, e.g., *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 510, 970 A.2d 578 (2009) ("speculation and conjecture . . . have no place in appellate review" (internal quotation marks omitted)). Rather, it is illustrative of why, in *McCoy*, issues of trial strategy were, and still are, left in the hands of the trial attorney. It is all too easy to second guess a trial attorney's strategy, especially if it is unsuccessful. Put simply, *McCoy* and its progeny did not establish a separate constitutional claim in the event that a trial attorney raises an unsuccessful defense that was pursued against the defendant's wishes.

We are mindful that there may be situations in which an attorney is constitutionally precluded from advancing an affirmative defense against her client's wishes.[21] That

culpability against Satan, citing Connecticut Code of Evidence § 7-2. The court questioned the petitioner on how he planned to introduce evidence that Satan had, in fact, possessed his body and committed the crimes. The petitioner responded, stating that scientifically proving demons exist would be "pretty darn tough to do."

[20] As we discuss in part II of this opinion, the petitioner's cocaine use likely obviated the ability to pursue, for example, a defense based on mental disease or defect.

[21] See, e.g., *Petrovich* v. *Leonardo*, 229 F.3d 384, 386–87 (2d Cir. 2000) (suggesting that, under facts set forth in habeas petition, petitioner's decision to forgo EED defense was "akin to other, fundamental trial decisions" and assuming that, if court's "analogy is sound, a court must accept a defendant's will in such matters"), cert. denied, 532 U.S. 981, 121 S. Ct. 1623, 149 L. Ed. 2d 485 (2001); *Brenton* v. *Commissioner of Correction*, 325 Conn. 640, 698–99, 159 A.3d 1112 (2017) (Our Supreme Court noted that defense attorneys have "an ethical obligation to comply with an informed defendant's refusal to allow presentation of a mental disease or defect defense or mitigating evidence in the penalty phase of a capital case. . . . [That precept] extends to a client's instruction to his attorney not to present an extreme emotional disturbance defense." (Citations omitted.)). Both *Petrovich* and *Brenton* are factual

is not the case here. In sum, we find McCoy inapplicable to the petitioner's case because his attorney honored his not guilty plea and did not concede his client's guilt at trial. The habeas court, therefore, improperly concluded that Isko violated the petitioner's sixth amendment

inverses of the petitioner's case, as they involved attorneys acquiescing to their clients' wishes not to pursue an EED defense.

*Petrovich* was a waiver of counsel case, in which the petitioner analogized the trial court's and his trial counsel's acquiescing to his desire not to instruct the jury on EED to a waiver of counsel. *Petrovich* v. *Leonardo*, supra, 229 F.3d 386. The United States Court of Appeals for the Second Circuit found that, contrary to the petitioner's assertion, he did not waive counsel when waiving the jury instruction. Id. The Second Circuit thus concluded the trial court was not required to canvass the petitioner on that decision. Id. The petitioner alternatively claimed that the decision to raise a defense was fully within his attorney's province, not his, and the trial court should have ignored his assertions and his attorney's acquiescence and elected the contrary decision of counsel. Id. The Second Circuit declined to grant the writ of habeas corpus on that basis and noted that such a decision was "akin" to other recognized "fundamental trial decisions" like the decision to plead insanity. Id.

*Brenton* was an ineffective assistance of counsel case, in which our Supreme Court declined to find ineffective assistance when the petitioner gave defense attorneys clear instructions not to any present mitigating evidence. *Brenton* v. *Commissioner of Correction*, supra, 325 Conn. 680. The petitioner in that case further refused "to assist in the development and presentation of mitigation evidence . . . ." Id., 690. As our Supreme Court explained, attorneys have an ethical obligation to "comply with an informed defendant's refusal to allow presentation of a mental disease or defect defense or mitigating evidence in the penalty phase of a capital case." Id., 698. In the present case, by contrast, the petitioner proffered mitigating evidence, albeit as testimonial evidence and in pursuit of a noncognizable defense of demonic possession.

Furthermore' we note that, in *United States* v. *Rosemond*, supra, 958 F.3d 122, the Second Circuit clearly stated that a criminal defense attorney's concession of one element of a charged crime does not violate a defendant's autonomy rights. Id. In *Rosemond*, the Second Circuit held that the petitioner's trial counsel did not violate his sixth amendment autonomy rights when he admitted to *a* crime, just not the *charged* crime. Id. In the present case, Isko did not concede the petitioner's guilt to *any* crime. We reiterate that EED is a defense resulting in manslaughter only as an alternative to murder, for which mitigation is fully predicated upon the jury first finding for the state all the elements of murder. Notably, Isko did so after the petitioner exercised his right to testify on his own behalf and admitted he engaged in the physical acts proscribed by the criminal statutes. See footnotes 6, 8, 12 and 13 of this opinion.

rights under McCoy.[22]

## II

The respondent also claims, with respect to count eight, that the court improperly concluded that Isko rendered ineffective assistance of counsel by failing to raise a mental disease or defect defense at trial. We agree.

"It is well established that the sixth amendment to the United States constitution guarantees the right to effective assistance of counsel." *State* v. *Vega*, 259 Conn. 374, 386, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); see also *Strickland* v. *Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("The [s]ixth [a]mendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must

---

[22] In count six of the operative petition, the petitioner alleged that Wagner, his criminal appellate counsel, rendered ineffective assistance due to her failure to raise a sixth amendment right to autonomy claim pursuant to *McCoy*. The habeas court's decision is unclear as to whether it ruled in the petitioner's favor on that count. In its memorandum of decision, the court stated: "As to Wagner, the court concludes that she did not perform deficiently in light of the unusual circumstances of this case. Even though *McCoy* was issued prior to our Supreme Court's decision in [*State* v.] *Jan G.* [supra, 329 Conn. 465], the court credits Wagner's testimony that she would have been unable to raise this issue on direct appeal due to the need to develop a factual record. In the alternative, if the record was sufficient to raise the issue on appeal and *McCoy* did not announce a new rule, the court finds that Wagner performed deficiently by failing to seek to brief the issue in the months between the issuance of *McCoy* and *Jan G.* . . . and there is a reasonable likelihood of a different outcome in light of this court's conclusion (count six)." (Footnote omitted.) The court's explicit statement that it was ruling on this count of the operative petition in the alternative is perplexing. To the extent that the court concluded that Wagner rendered ineffective assistance of counsel due to her failure to raise a sixth amendment claim pursuant to *McCoy*, that conclusion cannot stand for the reasons discussed in this opinion.

satisfy the two-pronged test articulated in [*Strickland*]. . . . *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong." **(**Citation omitted; internal quotation marks omitted.**)** *Canady* v. *Commissioner of Correction*, 231 Conn. App. 603, 612, 333 A.3d 797, cert. denied, 352 Conn. 901, 334 A.3d 1006 (2025).

To satisfy the performance prong, the petitioner "must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, [the petitioner] must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." **(**Internal quotation marks omitted.**)** *Abdus-Sabur* v. *Commissioner of Correction*, 233 Conn. App. 435, 452, 340 A.3d 479, cert. granted, 353 Conn. 914, 344 A.3d 155 (2025).

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Nevertheless, [j]udicial scrutiny of counsel's performance *must be highly deferential*. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court *must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*; that is, the

[the petitioner] must overcome the presumption that, under the circumstances, the challenged action *might* be considered sound trial strategy. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Emphasis in original; internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 831–32, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021). Further, "strategic choices made after thorough investigation of law and facts relevant to plausible options *are virtually unchallengeable* . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 832.

To raise a colorable affirmative defense of mental disease or defect, a criminal defendant must show that the "defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Under Connecticut law, that defense is not available if the defendant's "mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof . . . ." General Statutes § 53a-13 (b) (1).

In its memorandum of decision, the habeas court found that Buchanan had "concluded that [the petitioner's] mental state at the time of the offense satisfied the requirements of § 53a-13, establishing the defense of mental disease or defect." The habeas court further concluded that Isko believed that Buchanan had not concluded that the petitioner's mental state satisfied the requirements of the mental disease or defect defense.

Thus, the habeas court concluded that Isko "did not pursue the [mental disease or defect] defense because he did not believe [that] Buchanan's report supported the defense. This was erroneous and constitutes deficient performance." We disagree.

In considering the petitioner's ineffective assistance of counsel claim, the question is not whether, in fact, the petitioner suffered from a mental disease or defect. The question is whether it fell within the "*wide range of reasonable professional assistance*"; (emphasis in original; internal quotation marks omitted) *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 831; for Isko to make the strategic decision to forgo pursuing such a defense in light of the information available to him at the time he made it.

It is clear from the record before us, and the habeas court found, that Isko did not believe that the petitioner's mental state rose to the level of a mental disease or defect. The court also found that Buchanan believed that the petitioner suffered from a mental disease or defect that would allow him to raise a defense of mental disease or defect. At the same time, Buchanan credited the petitioner's drug use for "[s]ome of the mental illness" and the petitioner's psychosis.[23] Further, Buchanan's belief in the petitioner's psychotic illness is somewhat contradicted by Baranoski's report, in which she concluded that the petitioner had a "schizotypal personality disorder" and not a "primary psychotic disorder." Moreover, Isko testified at the habeas trial that he believed the petitioner's admitted cocaine usage largely precluded him from raising a mental disease or defect defense at his criminal trial. The record is clear, and the petitioner does not dispute, that he had consumed a large quantity of cocaine on the night of the murder,

---

[23] At the petitioner's criminal trial, Buchanan testified: "[The] onset of [the petitioner's] symptoms follow the reinstatement of his cocaine dependence" and the petitioner's symptoms resolved "when he no longer had access to cocaine," which "suggests that cocaine use was an important factor" in the petitioner's psychosis.

and that his mental health was linked to his drug use.[24] Buchanan's testimony at the petitioner's criminal trial affirmatively linked the petitioner's cocaine usage with his mental state, as did the petitioner's own testimony at that trial. Significantly, the record also demonstrates that Buchanan and Baranoski reached somewhat differing conclusions as to the petitioner's psychosis. In any event, the habeas court's conclusion that "the only evidence . . . that [Isko] did not pursue the defense [was] because he did not believe [Buchanan's] report supported the defense" fails to acknowledge the obstacle presented by the petitioner's cocaine use.

We reiterate, however, what is not at issue. Whether the evidence supports the viability of a mental disease or defect defense is not the relevant inquiry. Rather, the petitioner must overcome the presumption that Isko's trial strategy was sound and reasonable under the circumstances. To that end, we conclude that, in light of the record before us and the habeas court's factual findings, Isko's decision to forgo the mental disease or defect defense was a reasonable trial strategy based upon the information available to him at the time he made it. Such a tactic was certainly within the "wide range of reasonable professional assistance"; (emphasis omitted; internal quotation marks omitted) *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 831; Isko offered the petitioner. We therefore agree with the respondent that the petitioner did not satisfy his burden of demonstrating that Isko made errors at his criminal trial that were so "serious" that he failed to function "as the counsel guaranteed . . . by the [s]ixth [a]mendment." (Internal

---

[24] At his criminal trial, the petitioner admitted to using, on the night of his father's murder, 90 percent of his average weekly cocaine consumption. Our Supreme Court, in its factual recitation in the petitioner's direct criminal appeal, noted that the petitioner "consumed a large quantity of cocaine" and admitted to police officers that his behavior was due to his drug usage. *State* v. *Jan G.*, supra, 329 Conn. 468–69.

quotation marks omitted.) *Abdus-Sabur* v. *Commissioner of Correction*, supra, 233 Conn. App. 452.[25]

The judgment is reversed in part and the case is remanded with direction to deny the petition for a writ of habeas corpus with respect to the fifth, sixth, seventh, and eighth counts of the petition; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[25] "In light of our determination that the petitioner failed to establish that [counsel's] performance was deficient, we need not address the prejudice prong." *Quint* v. *Commissioner of Correction*, 211 Conn. App. 27, 36 n.7, 271 A.3d 681, cert. denied, 343 Conn. 922, 275 A.3d 211 (2022).